******************************************************

The "officially released" date that appears near the
beginning of an opinion is the date the opinion will be
published in the Connecticut Law Journal or the date it
is released as a slip opinion. The operative date for the
beginning of all time periods for the filing of postopinion
motions and petitions for certification is the "officially
released" date appearing in the opinion.

All opinions are subject to modification and technical
correction prior to official publication in the Connecti-
cut Law Journal and subsequently in the Connecticut
Reports or Connecticut Appellate Reports. In the event
of discrepancies between the advance release version of
an opinion and the version appearing in the Connecticut
Law Journal and subsequently in the Connecticut Reports
or Connecticut Appellate Reports, the latest version is
to be considered authoritative.

The syllabus and procedural history accompanying an
opinion that appear in the Connecticut Law Journal and
subsequently in the Connecticut Reports or Connecticut
Appellate Reports are copyrighted by the Secretary of the
State, State of Connecticut, and may not be reproduced
or distributed without the express written permission of
the Commission on Official Legal Publications, Judicial
Branch, State of Connecticut.

******************************************************

# IN RE JAHVAR S. ET AL.[*]
# (AC 49513)

Alvord, Elgo and Clark, Js.

*Syllabus*

The respondent mother appealed from the trial court's judgments termi-nating her parental rights as to one of her minor children and permanently transferring legal guardianship of another of her minor children. The mother claimed that she was denied her statutory (§§ 45a-717 (b) and 51-296a (a)) right to the effective assistance of counsel when her trial attorney failed to object on hearsay grounds to evidence of the mother's threatening statements to Department of Children and Families' social workers and others. *Held*:

The respondent mother failed to establish that she was denied her statutory right to the effective assistance of counsel, as her trial attorney's decision not to raise a hearsay objection did not constitute deficient performance but, rather, could be seen to constitute objectively reasonable trial strategy, and, even if it was assumed that her attorney's decision was objectively unrea-sonable, this court could not conclude that the mother established that she was prejudiced by counsel's decision, as the trial court, in analyzing the rehabilitation issue pursuant to statute (§§ 17a-112 (j) and 46b-129 (j)), did not reference the mother's threats but considered factors that included her interactions with the criminal justice system, her episodic homelessness and minimal, intermittent and ineffective engagement in mental health treat-ment, and her ongoing inability to cooperate with social workers and deal with conflict in a productive manner.

Argued May 26—officially released July 29, 2026[**]

*Procedural History*

Petition by the Commissioner of Children and Fami-lies to terminate the respondents' parental rights with respect to their minor child Jahvar S. and motion for the

[*]In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the court.

Moreover, in accordance with federal law; see 18 U.S.C. § 2265 (d) (3) (2024); we decline to identify any person protected or sought to be protected under a protection order, protective order, or a restraining order that was issued or applied for, or others through whom that per-son's identity may be ascertained.

[**]July 29, 2026, the date that this decision was released as a slip opin-ion, is the operative date for all substantive and procedural purposes.

permanent transfer of legal guardianship of their minor child Elianna S., brought to the Superior Court in the judicial district of New Haven, Juvenile Matters, where the cases were tried to the court, *Conway, J.*; judgments terminating the respondent mother's parental rights as to Jahvar S. and permanently transferring legal guardianship of Elianna S., from which the respondent mother appealed to this court. *Affirmed*.

*Matthew C. Eagan*, assigned counsel, for the appellant (respondent mother).

*Franklin Kanin*, assistant attorney general, with whom, on the brief, was *William Tong*, attorney general, for the appellee (petitioner).

*Opinion*

CLARK, J. The respondent mother, Kamala S., appeals from the judgments of the trial court terminating her parental rights with respect to her minor son, Jahvar S., and granting the motion of the petitioner, the Commissioner of Children and Families, for permanent transfer of legal guardianship of her minor daughter, Elianna S.[1] The respondent's sole claim on appeal is that she was denied her statutory right to the effective assistance of counsel.[2] We disagree and, accordingly, affirm the judgments of the trial court.

The following facts, which the trial court found by clear and convincing evidence, and procedural history are relevant to this appeal. The respondent's involvement with the Department of Children and Families (department) dates back at least to December 2019, when

---

[1] In this opinion, we refer to Jahvar S. and Elianna S. individually by their first names and collectively as the children. We note that the petitioner had sought to terminate the rights of Jahvar's acknowledged father. The trial court found that Jahvar's acknowledged father had died in August 2024, prior to the termination of parental rights trial. Elianna's acknowledged legal father was defaulted for nonappearance in the neglect proceedings as to Elianna and failed to appear for any subsequent court appearances.

[2] The attorney for the minor children filed a statement adopting the brief of the petitioner pursuant to Practice Book § 79a-6 (c).

Elianna was adjudicated neglected after the respondent drove recklessly with Elianna in the car. Elianna initially remained in the respondent's care under an order of protective supervision. In March 2020, the petitioner obtained an order of temporary custody of Elianna after the respondent was incarcerated. In August 2020, the respondent was released from prison, the order of temporary custody was vacated, and Elianna was reunified with the respondent under an order of protective supervision.

Jahvar was born in June 2020. On April 14, 2022, the respondent reported to the department that she required respite childcare due to feeling overwhelmed and depressed. The petitioner invoked a ninety-six hour administrative hold and assumed temporary custody of the children. See General Statutes § 17a-101g (f). On April 18, 2022, the petitioner filed neglect petitions and motions for temporary custody for each child in the Superior Court for Juvenile Matters in Willimantic. On the same date, the court, *Carbonneau*, *J.*, granted the petitioner's motion for temporary custody. On December 6, 2022, the court, *Shaikh*, *J.*, adjudicated the children neglected and committed them to the care and custody of the petitioner.

After the adjudication of neglect, the respondent initially "successfully worked with an in-home reunification provider and said provider recommended reunification, contingent on [the respondent] reengaging in mental health treatment and medication services to process and address her anxiety and her other mental health diagnoses. The reunification provider also recommended [that the respondent] identify a support system and resolve her pending criminal charges." During the same time period, however, the respondent repeatedly exhibited aggressive and threatening behavior toward department social workers. The trial court found that, "[i]n January 2023, the respondent . . . threatened a department social worker, and her case was transferred to a different social worker. In April 2023, the respondent . . . threatened a social worker, stating, 'if you do it again, I'll gladly

knock you the fuck out and happily go to jail.' And, in June 2023, the respondent . . . emailed a department social worker, alleging [that] the worker had lied . . . in court . . . [and stated in the email] 'be glad I chose to let you continue to breathe.' Days later, the respondent . . . slammed a door into a social worker's leg and became verbally aggressive." In May 2023, the respondent was arrested twice, first for breach of the peace, disorderly conduct, and harassment and, subsequently, for breach of the peace, assault, criminal mischief, and threatening. The respondent was incarcerated from June through December 2023.

After her release from prison, the respondent relocated to West Haven, and the case was transferred to the Superior Court in the judicial district of New Haven for juvenile matters. The respondent refused to disclose her address to the department and, although she engaged in therapy at Cornell Scott Hill Health Center, she declined to sign releases to permit the department to communicate with her provider and declined to submit to a medication evaluation. During this time period, the respondent again repeatedly threatened department social workers. The trial court found that, "[o]n February 9, 2024, [the respondent] texted the department's visitation personnel the following: 'I will have a good weekend and I hope you die in your sleep this weekend.'" The court also found that, when "the department informed [the respondent that] an alternative visitation provider was being sought . . . [the respondent] responded with: 'There's no visit scheduled because you're a dumb ass bitch who is not capable of doing your job correctly. I hope you get into a car accident and die with you[r] children in the car on your way home bye.'" Sometime in mid-2024, the respondent was charged with violating her conditions of probation by failing to report to probation as required, refusing to disclose her address, and failing to comply with treatment. In August 2024, the respondent was arrested for burglary in the first degree. The respondent

was reincarcerated from August 2024 through February 2025.

When she was released from prison, the respondent provided the Department of Correction with an invalid address and telephone number. The respondent was homeless from February through June 2025 and did not inform the department of her whereabouts. In March 2025, the respondent reached out to the department but refused to disclose her work schedule or provide confirmation of employment. In June 2025, the respondent obtained an apartment in New London but refused to allow the department to access her residence.

The respondent's threatening behavior continued during this time period. The trial court found that, after a miscommunication resulted in a missed visit between the respondent and Elianna on April 3, 2025, the "respondent . . . texted the department social worker [that she] 'better find something safe to do.'" The court also found that the respondent had contacted Elianna's foster mother and "verbalized an intent to go to the foster home and bang on the door until she was granted access to Elianna," and threatened to "blow up the department's Milford building. Milford police were alerted, and [the respondent] was involuntarily, psychiatrically admitted to a hospital in Bridgeport for approximately [one] week. [The respondent] attended two follow up appointments at Life Bridge Community Services . . . but she would not sign releases permitting the department to communicate with Life Bridge." (Footnotes omitted.)

The petitioner filed a petition for termination of parental rights as to Jahvar on March 4, 2025. On April 9, 2025, the petitioner filed a motion for permanent transfer of legal guardianship as to Elianna. In both the termination petition and the motion for permanent transfer of legal guardianship, the petitioner alleged that the department had made reasonable efforts to reunify the respondent with the children and that the respondent

had failed to achieve sufficient personal rehabilitation to encourage the belief that, within a reasonable time, she would be able to assume a responsible position in the children's lives. See General Statutes §§ 17a-112 (j) and 46b-129 (j).[3] A trial on the termination petition and the guardianship motion was held before the court, *Conway, J.*, on July 15 and August 29, 2025. The respondent was represented by Attorney Peter K. Manko as assigned counsel. The petitioner presented the testimony of Lianna Carrero, a social worker for the department. The petitioner also introduced into evidence without objection

[3]General Statutes § 17a-112 (j) provides in relevant part: "The Superior Court, upon notice and hearing as provided in sections 45a-716 and 45a-717, may grant a petition filed pursuant to this section if it finds by clear and convincing evidence that (1) the Department of Children and Families has made reasonable efforts to locate the parent and to reunify the child with the parent in accordance with subsection (a) of section 17a-111b . . . (2) termination is in the best interest of the child, and (3) . . . (B) the child (i) has been found by the Superior Court or the Probate Court to have been neglected, abused or uncared for in a prior proceeding . . . and the parent of such child has been provided specific steps to take to facilitate the return of the child to the parent pursuant to section 46b-129 and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . ."

General Statutes § 46b-129 (j) (7) provides in relevant part: "Prior to issuing an order for permanent legal guardianship, the court . . . shall find by clear and convincing evidence that the permanent legal guardianship is in the best interests of the child or youth and that the following have been proven by clear and convincing evidence . . . (A) One of the statutory grounds for termination of parental rights exists, as set forth in subsection (j) of section 17a-112, or the parents have voluntarily consented to the establishment of the permanent legal guardianship; (B) Adoption of the child or youth is not possible or appropriate; (C) (i) If the child or youth is at least twelve years of age, such child or youth consents to the proposed permanent legal guardianship, or (ii) if the child is under twelve years of age, the proposed permanent legal guardian is: (I) A relative, (II) a caregiver, or (III) already serving as the permanent legal guardian of at least one of the child's siblings, if any; (D) The child or youth has resided with the proposed permanent legal guardian for at least a year; and (E) The proposed permanent legal guardian is (i) a suitable and worthy person, and (ii) committed to remaining the permanent legal guardian and assuming the right and responsibilities for the child or youth until the child or youth attains the age of majority."

eight documentary exhibits, including four social studies[4] and a status report prepared by the department.

On September 26, 2025, the trial court issued a memorandum of decision granting both the petition for termination of parental rights and the motion for transfer of legal guardianship. The court found by clear and convincing evidence that the department had made reasonable efforts to reunify the respondent with the children and that the respondent had failed to achieve sufficient rehabilitation to encourage the belief that, within a reasonable time, she would be able to assume a responsible position in the children's lives. As to the department's reunification efforts, the court found that, "[n]otwithstanding [the respondent's] years of threatening and verbally abusive behaviors toward department social workers (which, at times, culminated in her being arrested and incarcerated), the department persisted in making reasonable reunification efforts. The department had social workers interact with the respondent . . . in an attempt to deescalate the discord between [the respondent] and various assigned treatment social workers. And when [the respondent] was not incarcerated, the department contracted with Safeway Families Services to facilitate supervised parent-child visitation sessions, thereby minimizing the risk of antagonizing the respondent . . . . The department consistently reiterated to [the respondent] what she needed to do for reunification to be possible: sign releases so the department could contact her providers and accurately assess [the respondent's] treatment goals and her progress in achieving said goals . . . permit the department to fully assess and vet where

---

[4]"A social study is a document prepared by the department that compiles relevant information regarding the respondent's history with the department, including notes from caseworkers, medical professionals, visit supervisors, and other relevant parties. . . . In a termination of parental rights proceeding, there may be multiple social studies produced by the department as the case develops and the department's goals progress (i.e., shift from reunification to termination, or vice versa)." (Citation omitted.) *In re A. H.*, 226 Conn. App. 1, 7 n.4, 317 A.3d 197, cert. denied, 349 Conn. 918, 317 A.3d 784 (2024).

and with whom she resides, provide verification of stable . . . housing and sustainable employment and/or a means to support herself." (Footnote omitted.)

With respect to the respondent's rehabilitation, the trial court noted that, "[i]n assessing parental rehabilitation, the court may consider the parent's compliance with the court-ordered specific steps. . . . The court has already recounted [the respondent's] failure to timely sign releases, the challenges surrounding scheduling supervised visitations, her cycling in and out of the criminal justice system, her episodic homelessness, and her minimal, intermittent, and ineffective engagement in mental health treatment." (Citation omitted.) The court further noted that, at the time of trial, the respondent was employed full-time, had her own vehicle and health insurance, and had obtained an apartment. The court also noted that it had carefully considered the respondent's testimony that she had recently committed to seriously engaging in mental health treatment and that, "now, when she feels someone or something is triggering her, instead of reacting in a negative and/or offensive manner, she has the skill set to remain calm and in control." As the court observed, however, despite testifying that "she had not made any threatening statements in over a year," the respondent conceded that, "just days prior to her trial testimony . . . she communicated the following to Jahvar's paternal grandmother: 'You killed your own son, you won't do it to mine, that's a promise by all means necessary. I hope you die in your sleep dumbass old bitch.'"

The trial court observed that "[a] critical component to reunification efforts is a parent's ability to work collaboratively with the department and with reunification providers. For over three years, the department has attempted to work with [the respondent] and to have her substantively engaged in beneficial mental health treatment. [The respondent] does not trust or respect the department, and she remains incapable of effectively

collaborating with the department currently or in the foreseeable future.

"The court recognizes [that the respondent] loves her children and [that they] share a loving bond. However, any sustained and meaningful benefit [the respondent] may someday derive from her July 2025 reengagement with mental health treatment is yet to display itself. Her inability to understand the implications of wishing that Jahvar's grandmother (his current caregiver) die in her sleep is the antithesis of appropriate and nurturing parenting. Moreover, to express such a sentiment in the midst of trial, as she attempts to portray herself as having successfully addressed her mental and emotional health issues, says volumes about how little, if any, progress she has made to date.

"The children have waited over three years for their mother to sufficiently rehabilitate as a parent. Again, to her credit, [the respondent] has recently obtained a leased apartment (which the department has yet to be granted access to), and she is employed, and apparently able to support herself, and maintain a car and health insurance. However, she has not successfully addressed her mental and emotional health, and the repercussions of that reality continue to reverberate. The children need and deserve a stable and responsible caregiver who is capable of interacting with others in a nonthreatening, nonaggressive, or [non]vulgar manner, even when faced with real or perceived stressful interactions or situations. [The respondent] lacks sufficient mental and emotional health to maintain the requisite composure and self-control [that] effective parenting requires. Accordingly, the petitioner has proven [the respondent's] failure to rehabilitate."

With respect to the termination of parental rights as to Jahvar, the trial court made findings as to each of the criteria set forth in § 17a-112 (k)[5] and concluded that the

[5]General Statutes § 17a-112 (k) provides: "Except in the case where termination of parental rights is based on consent, in determining whether to terminate parental rights under this section, the court shall

termination of the respondent's parental rights was in Jahvar's best interest. With respect to the motion for transfer of permanent legal guardianship as to Elianna, the court found that the petitioner had established by clear and convincing evidence each of the factors set forth in § 46b-129 (j).[6]

On appeal, the respondent claims that Manko, her assigned counsel during the proceedings in the trial court, rendered ineffective assistance by failing to object on hearsay grounds to testimony and exhibits presented by the petitioner concerning the respondent's threatening statements. Specifically, the respondent notes that the following threatening statements, all of which were cited by the trial court in the memorandum of decision, were included within the petitioner's documentary exhibits: the respondent's April 2023 statement to a department social worker that she would "gladly knock

consider and shall make written findings regarding: (1) The timeliness, nature and extent of services offered, provided and made available to the parent and the child by an agency to facilitate the reunion of the child with the parent; (2) whether the Department of Children and Families has made reasonable efforts to reunite the family pursuant to the federal Adoption and Safe Families Act of 1997, as amended from time to time; (3) the terms of any applicable court order entered into and agreed upon by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order; (4) the feelings and emotional ties of the child with respect to the child's parents, any guardian of such child's person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties; (5) the age of the child; (6) the efforts the parent has made to adjust such parent's circumstances, conduct, or conditions to make it in the best interest of the child to return such child home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions, and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child; and (7) the extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent."

[6]See footnote 3 of this opinion.

you the fuck out and happily go to jail"; the respondent's June 2023 email to a department social worker, stating, "be glad I chose to let you continue to breathe"; a June 2023 incident in which the respondent slammed a door into a department social worker's leg; and the respondent's February 2024 text message to a department social worker, stating, "I hope you get into a car accident and die with you[r] children in the car on your way home." Additionally, the respondent notes that Carrero, a department social worker, testified at trial that Elianna's foster mother had reported to the department the respondent's threat to "go to the foster home and bang on the door until she was granted access to Elianna" and to "blow up the department's Milford building." The respondent argues that the aforementioned evidence was hearsay and that Manko was ineffective for failing to object to it because it "is of such a nature that it can only be damaging, and any reasonable attorney would seek to exclude it from trial."

The following legal principles guide our review of the respondent's claim. Parents in termination of parental rights proceedings and transfer of legal guardianship proceedings have a statutory right to counsel. See General Statutes §§ 45a-717 (b) and 51-296a (a).[7] In *State* v. *Anonymous*, 179 Conn. 155, 425 A.2d 939 (1979), our Supreme Court held that, "[w]here . . . a statute . . . or [P]ractice [B]ook rule . . . mandates the assistance of counsel, it is implicit that this means competent counsel.

---

[7] General Statutes § 45a-717 (b) provides in relevant part: "If a respondent parent appears without counsel, the court shall inform such respondent parent of his or her right to counsel and upon request, if he or she is unable to pay for counsel, shall appoint counsel to represent such respondent parent. No respondent parent may waive counsel unless the court has first explained the nature and meaning of a petition for the termination of parental rights. . . ."

General Statutes § 51-296a (a) provides in relevant part: "The judicial authority before whom a family relations matter . . . is pending shall determine eligibility for counsel for a child or youth and the parents or guardian of a child or youth if they are unable to afford counsel. Upon a finding that a party is unable to afford counsel, the judicial authority shall appoint an attorney to provide representation from a list of qualified attorneys provided by the office of Chief Public Defender."

Because of the substantial interests involved, a parent in a termination of parental rights hearing has the right not only to counsel but to the effective assistance of counsel." Id., 160.

"In determining whether counsel has been ineffective in a termination [or neglect] proceeding, we have enunciated the following standard: The range of competence . . . requires not errorless counsel, and not counsel judged ineffective by hindsight, but counsel whose performance is reasonably competent, or within the range of competence displayed by lawyers with ordinary training and skill in [that particular area of the] law. . . . The respondent must prove that [counsel's performance] fell below this standard of competency and also that the lack of competency contributed to the termination of parental rights. . . . A showing of incompetency without a showing of resulting prejudice . . . does not amount to ineffective assistance of counsel. . . . In making such a claim, it is the responsibility of the respondent to create an adequate record pointing to the alleged ineffectiveness and any prejudice the respondent claims resulted from that ineffectiveness." (Citation omitted; internal quotation marks omitted.) *In re Christopher C.*, 129 Conn. App. 55, 58–59, 20 A.3d 689 (2011). "In the absence of findings by the trial court in this regard, we directly review the trial court record. . . .

"We are mindful that [a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that [the] conduct [of trial counsel] falls within the wide range of reasonable professional assistance; that is, [an appellant] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." (Citations omitted; internal quotation marks omitted.) *In re Wendy G.-R.*,

225 Conn. App. 194, 205, 314 A.3d 1029, cert. denied, 349 Conn. 916, 316 A.3d 357 (2024).

As this court recently reaffirmed, when a respondent raises an ineffective assistance claim on direct appeal and the record does not contain evidence of counsel's trial strategy, "we, as a reviewing court, are mindful of the presumption that counsel acted reasonably, and we must contemplate possible strategic reasons that might have supported counsel's challenged actions before considering whether those actions were objectionably reasonable." Id., 208. "In the absence of evidence of counsel's actual strategic reasoning for the choices challenged by the [respondent], the [respondent] is left to demonstrate, essentially, that no possible objectively reasonable strategy or tactic existed that would justify counsel's choices." *Crocker* v. *Commissioner of Correction*, 220 Conn. App. 567, 592, 300 A.3d 607, cert. denied, 348 Conn. 911, 303 A.3d 10 (2023). Thus, to establish that counsel's performance was not reasonably competent, "the respondent must demonstrate that counsel's failure to object cannot be explained by one or more possible strategic reasons that are objectively reasonable." (Internal quotation marks omitted.) *In re S. F.*, 229 Conn. App. 1, 11–12, 314 A.3d 1029, cert. denied, 350 Conn. 932, 316 A.3d 357 (2024).

We conclude that the respondent has not satisfied her burden of demonstrating that Manko's performance was objectively unreasonable. The respondent concedes that, if the petitioner had presented testimony from the individuals to whom the threatening statements were made, the statements would have been admissible as statements of a party opponent. See Conn. Code Evid. § 8-3 (1).[8] There is nothing in the record to indicate that those individuals were not available to testify. Thus, for purposes of our analysis, we must assume that, if Manko had objected to the admission of the respondent's

[8] Section 8-3 (1) of the Connecticut Code of Evidence provides in relevant part that "[a] statement that is being offered against a party and is . . . the party's own statement" is not excluded by the hearsay rule.

threatening statements in the form of the documentary exhibits and Carrero's testimony, and the court had sustained that objection,[9] the petitioner nevertheless would have been able to introduce the statements by calling the recipients of the threats to testify.

Requiring the petitioner to present the testimony of each person who was the subject of the respondent's threats may have been a risky strategy, as it would have opened the door to the possibility that those witnesses might reveal additional details about the respondent's threats that were not contained in the reports or Carrero's testimony. See, e.g., *McGee* v. *Commissioner of Correction*, 157 Conn. App. 863, 870, 118 A.3d 140 ("[a]s any trial lawyer knows, anytime questions are put to a witness, a risk exists that unhelpful information will be disclosed"), cert. denied, 318 Conn. 903, 122 A.3d 633 (2015). Moreover, the prospect of having a series of witnesses testify from personal knowledge about the respondent's threats would have increased the amount of trial time focused on the respondent's threatening behavior. As the petitioner argues in her appellate brief, Manko reasonably may have determined that, under the circumstances, it was preferable for the court to learn about the respondent's threatening statements "in the form of short statements or summaries of threats to faceless individuals buried inside longer reports." We cannot conclude that such a strategic decision would have been objectively unreasonable. Accordingly, we conclude

[9]The petitioner argues that Manko's decision not to object does not constitute deficient performance because, at least with respect to the documentary exhibits, the threatening statements were admissible under the business record exception to the hearsay rule. See General Statutes § 52-180; Conn. Code Evid. § 8-4. The petitioner does not argue that any exception to the hearsay rule would have applied to Carrero's testimony concerning the respondent's threat to "blow up the department's Milford building." For the reasons explained herein, we conclude that, even assuming that all of the threatening statements in the documentary exhibits and Carrero's testimony would have been inadmissible under the rule against hearsay, the respondent cannot meet her burden to establish that Manko rendered ineffective assistance of counsel.

that the respondent has not met her burden to establish that counsel's performance was deficient.

For similar reasons, we also conclude that, even assuming that Manko's decision not to raise a hearsay objection was objectively unreasonable, the respondent has not established that she was prejudiced by that decision. To establish that counsel's deficient performance resulted in prejudice, the respondent must establish "that any alleged inadequacy of counsel could have affected the outcome of the . . . proceedings." (Internal quotation marks omitted.) *In re Zen T.*, 149 Conn. App. 376, 382, cert. denied, 312 Conn. 911, 93 A.3d 593 (2014). As we have explained, if Manko had objected to the evidence in question on hearsay grounds and the trial court had sustained that objection, the petitioner would have been able to introduce evidence of the respondent's threatening statements by presenting testimony from the individuals to whom the statements were made. Thus, to establish that she was prejudiced by Manko's decision not to raise a hearsay objection, the respondent would have to establish either that the recipients of the threats would not have been available to testify or that, if they did testify, their testimony would have been so much more favorable to the respondent that the failure to object to the exhibits contributed to the termination of her parental rights. There is no evidence in the record, however, concerning the availability of those potential witnesses or what those witnesses would have said had they been called to testify.

Moreover, as the petitioner argues, in the section of the memorandum of decision addressing whether the respondent had failed to rehabilitate, the trial court did not reference the respondent's earlier threats that were introduced by way of the hearsay statements at issue. Rather, after noting that it had considered a number of factors, including the respondent's "failure to timely sign releases, the challenges surrounding scheduling supervised visitations, her cycling in and out of the criminal justice system, her episodic homelessness, and

her minimal, intermittent, and ineffective engagement in mental health treatment," the court went on to focus on evidence of the respondent's ongoing inability to cooperate with the department and to deal with conflict in a productive manner. Specifically, the court found that the respondent "*remains* incapable of effectively collaborating with the department *currently* or in the foreseeable future," and that she has "yet to display" that she derived "any sustained and meaningful benefit . . . from her July 2025 reengagement with mental health treatment . . . ." (Emphasis added.) In support of those findings, the court relied on the fact that, after the trial had commenced and just days before her testimony, the respondent threatened Jahvar's grandmother by stating: "You killed your own son, you won't do it to mine, that's a promise by all means necessary. I hope you die in your sleep dumbass old bitch." Noting that the respondent had admitted to making these statements but had downplayed their significance, the court found that the respondent's "inability to understand the implications of wishing that Jahvar's grandmother (his current caregiver) die in her sleep is the antithesis of appropriate and nurturing parenting" and demonstrated "how little, if any, progress [the respondent] has made to date." The court further found that the respondent "has not successfully addressed her mental and emotional health, and the repercussions of that reality *continue to reverberate.*" (Emphasis added.)

We reiterate that it is the respondent's burden to establish that she was prejudiced as a result of Manko's decision not to raise a hearsay objection. The trial court's analysis indicates that it determined that the respondent's actions had demonstrated an inability to cooperate with the department and to deal with conflict in a productive manner up through and including the time of trial. Although the respondent argues in her reply brief that the hearsay evidence of her prior threatening statements "undergirds" the court's determination, she does not identify anything in the court's analysis to support that conclusion. In light of the fact that the court's failure to

rehabilitate analysis expressly relied on evidence of the respondent's actions contemporaneous with the time of trial and did not reference the hearsay statements, we cannot conclude that the respondent established that she was prejudiced by Manko's decision not to raise a hearsay objection. Consequently, we conclude that the respondent has not established that she was denied her statutory right to the effective assistance of counsel.

The judgments are affirmed.

In this opinion the other judges concurred.